IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-01596-MSK-KLM

BREAKTHROUGH MANAGEMENT GROUP, INC.,

        Plaintiff,

v.

CHUKCHANSI GOLD CASINO AND RESORT,
JEFF LIVINGSTON,
PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS,
THE CHUKCHANSI ECONOMIC DEVELOPMENT AUTHORITY,
RYAN STANLEY, and
VERNON D'MELLO,

        Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to Defendants Chukchansi Gold

Casino and Resort, Picayune Rancheria of the Chukchansi Indians ("the Tribe"), and Chukchansi

Economic Development Authority's (collectively, "the Chukchansi Defendants") Motion to

Dismiss (**# 19**), the Plaintiff's response (**# 44**), and the Chukchansi Defendants' reply (**# 52**);

Defendant Livingston's Motion to Dismiss for Lack of Jurisdiction (**# 23**), the Plaintiff's response

(**# 43**), and Defendant Livingston's reply (**# 51**); Defendant Stanley's Motion to Dismiss for Lack

of Jurisdiction (**# 28**), the Plaintiff's response (**# 42**), and Defendant Stanley's reply (**# 53**); the

Plaintiff's Motion to Convert (**# 41**) the Defendants' motions to dismiss to summary judgment

motions pursuant to Fed. R. Civ. P. 12 and 56, the Chukchansi Defendants' response (**# 57**),

Defendant Livingston's response (**# 58**), Defendant Stanley's response (**# 59**), and the Plaintiff's

reply (**# 64**); Defendant D'Mello's Motion to Dismiss (**# 61**), the Plaintiff's response (**# 67**), and

Defendant D'Mello's reply (**# 74**); the Plaintiff's Motion to Convert (**# 72**) Defendant D'Mello's

motion to dismiss to a summary judgment motion, Defendant D'Mello's response (**# 75**), and the

Plaintiff's reply (**# 76**), and Defendant Stanley's Motion to Join (**# 80**).

## FACTS

According to the Complaint (**# 1**), the Plaintiff is a Colorado corporation that provides

training and consulting services via online education courses.  Defendant Chukchansi Gold Resort

and Casino ("the Casino"), is located in Madera County, California, and is owned and operated by

the Tribe.  The Casino purchased a single license for one of the Plaintiff's courses, ostensibly for

the Casino's Director, Defendant Stanley.  However, the Casino devised and implemented a

scheme to record and transcribe the class, thereby making it available to all of the Casino's 1,300

employees without further payment to the Plaintiff.  In doing so, the Casino duplicated the

Plaintiff's copyrighted content, and included the Casino's trademark in place of the Plaintiff's.

The Plaintiff asserts fourteen claims in this action: (i) copyright infringement under 17

U.S.C. § 501 against all Defendants; (ii) contributory copyright infringement against the

Chukchansi Defendants; (iii) vicarious copyright infringement against the Chukchansi Defendants;

(iv) trademark infringement under 15 U.S.C. § 1125(a) against all Defendants; (v) contributory

trademark infringement against the Chukchansi Defendants; (vi) vicarious trademark infringement

against the Chukchansi Defendants; (vii) a civil RICO claim against all Defendants under 18

U.S.C. § 1961; (viii) a claim for common-law conversion against all Defendants under Colorado

law; (ix) a claim for common-law misappropriation against all Defendants under Colorado law;

2

(x) breach of contract against the Casino based on its breach of the End User License Agreement ("EULA") accompanying the license to use the Plaintiff's product; (xi) breach of the implied covenant of good faith and fair dealing against the Casino based upon that breach; (xii) common-law fraud under Colorado law against all Defendants; (xiii) common-law unfair competition under Colorado law against all Defendants; and (xiv) a violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-105, against all Defendants.

The Chukchansi Defendants move (# 19) to dismiss the Complaint against them, arguing: (i) that the Court lacks subject-matter jurisdiction over this action because the Chukchansi Defendants are entitled to sovereign immunity; (ii) that the Complaint fails to state valid copyright claims because it does not allege that the Plaintiff had secured copyright registrations for the contents of the class; (iii) that the Chukchansi Defendants, as governmental entities, are "categorically immune" from RICO; and (iv) that the common-law conversion and misappropriation claims against them are preempted by federal copyright law.

Defendant Livingston moves to dismiss (# 23) the claims against him, arguing: (i) that, as a California resident with no connections to Colorado, the Court lacks personal jurisdiction over him; (ii) by acting in the scope of his employment as an employee of the Chukchansi Tribe, he is entitled to sovereign immunity; and (iii) that the proper venue for this action is the Eastern District of California.  Defendant Stanley moves to dismiss (# 28) the Complaint as against him, alleging effectively identical arguments to those presented by Defendant Livingston, and additionally moving to dismiss the RICO claim, both on the grounds that the Plaintiff fails to plead the existence of a RICO enterprise, and because the Complaint is insufficiently specific as to the

nature of the predicate acts.  Defendant D'Mello filed a motion to dismiss **(# 61)** that is

substantively identical to Defendant Stanley's motion.[1]

In response to these motions, the Plaintiff moved to convert **(# 41, 72)** each of the

motions to dismiss into motions for summary judgment, on the grounds that the defense of

sovereign immunity is intertwined with the merits of the case, and that the Plaintiff needs to

engage in discovery to respond to it.

## ANALYSIS

### A.  Sovereign immunity

The primary focus of all of the Defendants' motions are an assertion of sovereign

immunity, an argument that implicates the Court's subject-matter jurisdiction.  *E.F.W. v. St.*

*Stephen's Indian High School,* 264 F.3d 1297, 1302-03 (10th Cir. 2001); *Fletcher v. United*

*States*, 116 F.3d 1315, 1324 (10th Cir. 1997).  When a challenge is made to the Court's subject-

matter jurisdiction, the party asserting the existence of such jurisdiction – here, the Plaintiff –

bears the burden of establishing that such jurisdiction exists.  *Montoya v. Chao*, 269 F.3d 952,

955 (10th Cir. 2002).  Although sovereign immunity is recognized as an affirmative defense, it is

---

[1]Defendant Stanley then filed a "request for joinder" **(# 77)** with Defendant D'Mello's
motion.  This motion is somewhat curious, in that Defendant D'Mello's motion is nearly a
verbatim copy of Defendant Stanley's motion, and raises no new issues.  In any event, the entire
notion of "joining" in another party's motions is not recognized by this Court.  For a variety of
administrative and substantive reasons, "joining" in another party's motion creates undue burdens
on the Court in tracking the relief requested by a party and the reasons therefor.  Although
needless duplication of content already in the record should certainly be avoided, the preferred
means by which to do so is for each party seeking specific relief to make a separate motion for
such relief, and incorporate by specific reference those arguments in another party's papers that
the movant wishes to assert.  In other words, it is permissible to join in another party's previously-
asserted <u>argument</u>, but not in another party's <u>motion</u>.

clear that the party seeking to sue a sovereign entity bears the burden of showing that such immunity has been waived. *See e.g. James v. U.S.*, 970 F.3d 750, 752 (10th Cir. 1992).

Motions to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), *citing Holt v. United States,* 46 F.3d 1000, 1002-03 (10th Cir.1995). Where a Rule 12(b)(1) motion challenges the underlying facts of the case, the Court may not presume the truthfulness of the complaint's factual allegations; rather, the Court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts without converting the motion into one for summary judgment under Rule 56. *Sizova v. National Institute of Standards and Technology*, 282 F.3d 1320,1324 (10th Cir. 2002). However, such discretion does not exist, and the Court must convert the motion to one for summary judgment, where the substantive cause of action and the disputed jurisdictional facts are closely intertwined. *Id.* Whether such an intertwining exists depends on whether "resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Id.*

The Court need not reach the Plaintiff's motion for conversion because, as explained herein, it is able to determine the issue of sovereign immunity with respect to some Defendants as a matter of law, and must conduct an evidentiary hearing as to the status of the remaining Defendants.[2]

---

[2]The Court addresses the Plaintiff's claimed need for discovery below.

First, the Court begins with the Plaintiff's assertion that the Defendants waived sovereign immunity by entering into two license agreements with the Plaintiff.  The "eChampion" licensing agreement, attached as Exhibit F to the Plaintiff's response to the Chukchansi Defendants' motion, does not contain any content that expressly waives any sovereign immunity.  The agreement consists of three separate paragraphs of text,[3] one entitled "Ethics" and requiring that the student abide by the Plaintiff's rules and regulations; one entitled "Copyright," detailing types of prohibited reproduction of the course's content; and one entitled "Disclaimer," absolving the Plaintiff of liability for errors in the material or failure of the website.  The Plaintiff contends that this agreement contains the text "you agree to venue in the State of Colorado," but the Court is unable to locate such text in Exhibit F.  The Plaintiff also points to Section 12 of the "eBlack Belt" licensing agreement, reproduced as Exhibit G.  That agreement contains a provision reading "The parties agree that the sole and exclusive venue for any and all disputes involving, arising out of or related to this Agreement shall be the state and federal courts located within the state of Colorado, County of Boulder."[4]

The Plaintiff argues that agreement to a forum selection clause, of itself, is sufficient to waive sovereign immunity.  In support of this proposition, it relies first on *C&L Enterprises, Inc., v. Citizen Band Potawatomi Tribe*, 532 U.S. 411, 415 (2001).  There, the Supreme Court

---

[3]The Plaintiff has reproduced this agreement as screenshots from a computer, apparently as it appears to a user.  As a result, the agreement in a format consisting of small, somewhat unclear type, spread over several pages.  Unless there is some compelling need to present exhibits as they appear *in situ*, the parties are encouraged to present the contents of such exhibits in a way that emphasizes their readability.

[4]The Court assumes, without necessarily finding, that the Tribe itself can be held to the terms of this agreement, even though the agreement was entered into by an agent of the Casino.

6

explained that, to be effective, a tribe's waiver of its sovereign immunity must be "clear." *Id.* at 418. The Court found that the tribe's contractual agreement to submit any contract disputes to arbitration, there to be decided by Oklahoma law, and to permit any arbitral award to be enforced in "any court having jurisdiction," constituted a clear waiver of sovereign immunity. *Id.* at 415. The Plaintiff here goes on to cite two state court decisions that allegedly reach the same result as *C&L*, finding a waiver of sovereign immunity resulting from agreement to a forum selection clause coupled with an agreement to arbitrate. *Citing Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 407 (Colo. App. 2004), *and Smith v. Hopland Band of Pomo Indians*, 115 Cal.Rptr.2d 455, 459 (Cal. App. 2002). Although the facts and outcome in *Smith* are indistinguishable from *C&L*, the Plaintiff has misrepresented the applicability of *Rush Creek*. There, the court considered a contractual agreement between the parties that contained a forum selection clause (but no arbitration provision) vesting exclusive jurisdiction in Colorado courts, but did not have occasion to consider whether that clause was sufficient to waive the tribe's sovereign immunity because "[although] the tribe contended in its opening brief that the default clause in the contract did not constitute an express waiver of sovereign immunity, in oral argument it conceded the issue." 107 P.3d at 406.

The Plaintiff then goes on to argue that "mere inclusion of a choice of law provision – standing alone – has been held sufficient to constitute a waiver of tribal immunity." *Citing Building Inspector and Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp.*, 818 N.E.2d 1040 (Mass. 2004). As with *Rush Creek*, the Plaintiff has overstated the holding of *Wampanoag*. There, the court found a waiver of sovereign immunity in an agreement that provided that the Tribe would hold certain lands "in the same manner, and subject to the

7

same laws, as any other Massachusetts corporation." *Id.* at 1048-49. The court was particularly

persuaded by the agreement's use of the first four quoted words, explaining that "the words 'in

the same manner' convey a special, known, and obvious meaning" in the sovereign immunity

context, because they are the words used by the U.S. government and Commonwealth of

Massachusetts to waive their own sovereign immunity. *Id.* Indeed, as in *Rush Creek*, the court in

*Wamapanoag* expressly refused to reach the argument the Plaintiff makes here, explaining that

"we need not discuss in detail the additional argument that the tribe waived its sovereign immunity

by executing a settlement agreement that incorporated by reference the town's zoning bylaw,

which, in turn, expressly provides for judicial review and enforcement."[5] *Id.* at 1051.

Whether a forum selection clause, by itself, can operate as a waiver of sovereign immunity

is a question that has no clear answer. In *Ninigret Development Corp. v. Naraganset Indian

Wetuomuck Housing Auth.*, 207 F.3d 21, 30-31 (1st Cir. 2000), a pre-*C&L* case, the court stated

that "whether, and to what extent, an arbitration or forum-selection clause constitutes a waiver of

a tribe's sovereign immunity turns on the terms of that clause." It noted that "The courts are not

consistent on the degree of specificity that must be employed," and compares *Val-U-Const. Co. v.

Rosebud Sioux Tribe*, 146 F.3d 573, 566-68 (8th Cir. 1998) (waiver found where Tribe agreed to

arbitration clause) with *Pan American Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416,

---

[5]The court does make a passing observation that "[t]his argument . . . has persuasive force and further supports our conclusion that, with respect to sovereign immunity, the Tribe knowingly bargained for . . . judicial action, where necessary." 818 N.E.2d at 1050. Besides being dicta, this observation is of little persuasive value, as it does not reveal the court's reasoning as to why this aspect of the agreement indicated a waiver of immunity, nor does it indicate whether the court would have been prepared to rule against the Tribe solely on that basis if, as here, the "in the same manner" language did not exist.

418-20 (9th Cir. 1989) (finding no waiver on similar arbitration clause).  The juxtaposition

between *Val-U* and *Pan American* – courts reaching disparate results on effectively identical facts

– confuses, rather than clarifies, the issue.

This Court draws more guidance from *Val-U*'s own discussion comparing its holding to

*American Indian Agricultural Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d

1374 (8th Cir. 1985).  In *Standing Rock*, the Tribe was party to a promissory note that, among

other things, provided that "in the event of a collection action . . . the law of the District of

Columbia would apply."  *Val-U*, 146 F.3d at 577.  In finding this agreement insufficient to waive

the tribe's sovereign immunity, the court found that the tribe "did not explicitly consent to submit

any dispute . . . to a particular forum, or to be bound by its judgment."  The Court in *Val-U* noted

that this differed from the situation before it because, unlike *Standing Rock*, "the parties . . .

specifically designated an arbitral forum to settle disputes under the contract as well as arbitration

rules. . . The parties clearly manifested their intent to resolve disputes by arbitration, and the tribe

waived its sovereign immunity with respect to disputes under the contract."  146 F.3d at 577.

From these cases, this Court can discern the outlines of a rule that resolves the issue

presented here.  First, it is clear from *C&L* that a contractual provision agreeing to arbitrate

disputes and agreeing to the rules that will govern the arbitral body constitutes a waiver of

sovereign immunity.  This rule finds two important components: (i) an agreement to submit

disputes to a body for adjudication; and (ii) an agreement as to what particular body will hear

such disputes.  In this respect, it matches the observation of the Second Circuit in *Garcia v.

Akwesasne Housing Authority*, 268 F.3d 76, 86 (2d Cir. 2001), that inquiry into a purported

waiver "encompasses not merely <u>whether</u> it may be sued, but <u>where</u> it may be sued." (Quotation marks omitted, emphasis in original).

Here, the language of the parties' agreement is that "the sole and exclusive <u>venue</u> for any and all disputes involving . . .this Agreement shall be the state and federal courts located within the state of Colorado." (Emphasis added.) Notably, the parties' agreement here speaks only to <u>where</u> a suit may be brought, but it does not expressly or impliedly address <u>whether</u> a suit may be brought. Unlike cases such as *C&L*, the Tribe here did not expressly agree to submit any dispute for adjudication; it merely agreed as to where such adjudication would take place, if an adjudication were to occur. In this respect, the case is more akin to *Standing Rock*, where the tribe agreed that District of Columbia law would apply to any dispute, but did not necessarily agree to submit any such dispute to adjudication.

At first blush, it seems awkward to read a contract to specify <u>where</u> disputes may be resolved, but not to read it as providing <u>whether</u> disputes may be resolved. However, any awkwardness in this interpretation vanishes when one recognizes the peculiar circumstances of this case. Here, unlike the ordinary citizen that the Plaintiff typically enters into contracts with, the Tribe possesses a special cloak of immunity from suit. Thus, language in the Plaintiff's standard contract that would be sufficient to bind ordinary citizens to a particular dispute-resolution mechanism is not necessarily sufficient to bind the Tribe. Put simply, the Plaintiff's EULA does not specifically state that a purchaser agrees to be subject to suit because, in most instances, the purchaser does not otherwise enjoy the ability to avoid suit. This difficulty is compounded by the fact that, by all appearances, the Plaintiff never negotiated the terms of the contract with the Tribe. As the Complaint and supplemental evidentiary material attached to the

motions make clear, the EULA was presented on a take-it-or-leave-it basis before a user could access the Plaintiff's course content.  There is no indication that the Plaintiff and the Tribe discussed the unique legal status enjoyed by the Tribe and crafted special contractual terms to account for the Tribe's immunity.  As a result, it should not be surprising that the standard terms of the EULA yield seemingly awkward results in this peculiar factual circumstance.  Nevertheless, the Court finds that the venue provision of the EULA is insufficient, of itself, to demonstrate that the Tribe clearly waived its sovereign immunity.

This finding is sufficient to grant the Tribe's motion to dismiss, as it indisputably enjoys sovereign immunity. However, the Plaintiff argues that, even if sovereign immunity applies, the remaining Defendants do not enjoy its protection for various reasons.  Thus, the Court turns to the issue of which other Defendants, if any, are swept up in the Tribe's immunity.

First, the Plaintiff contends that the Casino and the Tribe's Economic Development Authority do not enjoy the Tribe's immunity, because any judgment against them will not reach the Tribe's assets.  In support of this position, the Plaintiff relies on *Runyon v. Association of Village Council Presidents*, 84 P.3d 437, 440 (Ak. 2004), which examined the question of whether a non-profit association of native villages, formed to provide various services to the villages, was entitled to the sovereign immunity that the villages themselves enjoyed.  Finding that such immunity extended to subdivisions of tribal government that are "closely allied with and dependent upon the tribe," the court postulated a test which examined whether the entity's "connection to the tribe . . . is so close that allowing suit against the entity will damage the tribal interest that immunity protects."  *Id.*  In *Runyon*, the court ultimately found that the tribes had

formally insulated themselves from any liability for the non-profit association's acts, and thus, the court held that the association could not avail itself of the tribes' immunity.

This Court notes that the rule in *Runyon* has not enjoyed particularly broad adoption. According to Westlaw, only three cases have ever cited *Runyon,* and only one of them, an unpublished case from the District of Kansas, *Johnson v. Harrah's Kansas Casino Corp.*, 2006 WL 463138 (D. Kan. 2006) (unpublished), comes from a federal court. *Johnson* involved an employment dispute between a casino worker, employed at a casino owned by the Potowatomi Nation, and her employer, a non-Indian entity that managed the casino for the tribe in exchange for payment of a management fee. The employer attempted to invoke the tribe's sovereign immunity to the suit, forcing the court to examine the circumstances under which a non-tribal entity could enjoy the tribe's sovereign immunity. After distinguishing cases awarding immunity to tribal agencies and tribal housing authorities, the court was left to consider those cases that examined the immunity of "subordinate economic organizations" of a tribe. The court found that "[c]ourts have adopted various tests for determining whether" tribal immunity extends to a tribe's subordinate economic enterprise, and that most of the courts examine one or more of 10 separate factors, including economic interdependence.[6] The *Johnson* court treated *Runyon*'s single-issue

---

[6]The factors are: (i) the announced purpose for which the entity was formed; (ii) whether the entity was formed to manage or exploit specific tribal resources; (iii) whether federal policy protecting Indian assets is furthered by extending sovereign immunity to the entity; (iv) whether the entity is organized under the Tribe's laws or under federal law; (v) whether the entities purposes are similar to or serve tribal government; (vi) whether the entity's governance is drawn mainly from tribal officials; (viii) whether tribal officials exercise control over the organization; (ix) whether the Tribe has the power to dismiss members of the organization's governance; and (x) whether suit against the entity would impact the Tribe's fiscal resources.

analysis of economic interdependence as a threshold issue, such that, if the tribe's assets were potentially at risk, an examination of the remaining nine factors was appropriate.

Obviously, this Court is more persuaded by *Johnson*'s multi-factor analysis than it is by *Runyon*'s single-factor focus, and in the absence of persuasive law suggesting otherwise, this Court will adopt the *Johnson* analysis. Because that analysis is heavily fact-driven, and because the parties' submissions on the instant motions do not address the relevant facts,[7] the Court finds that an evidentiary hearing is necessary to determine whether the Economic Development Authority and the Casino enjoy a connection to the Tribe close enough to enjoy the Tribe's own immunity. The Court will set aside two hours for this hearing on **Tuesday, October 23, 2007** at **1:30 p.m.**[8]

---

[7]Attached to the Chukchansi Defendants' brief **(# 33)** is a document purporting to be an affidavit of Dixie Jackson. The document appears to relate the history of the Tribe and/or describe how it came to organize its gaming activities, but the document in the Court's electronic system is largely illegible.

[8]The Court declines to specifically authorize discovery in advance of this hearing. Given the substantial potential that the Defendants at issue may ultimately be entitled to sovereign immunity, the Court is reluctant to chip away at the benefits of such immunity by exposing them to the burdens of unnecessary discovery. *See e.g. Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (immunity from suit also protects party from burdensome discovery). More importantly, the factual issues to be resolved are simple and not generally the types of facts as to whose existence (*c.f.* significance) the parties can have widely divergent views.

The Court is cognizant of the Plaintiff's position that the Defendants have refused to provide important tribal documents bearing on the issues and that the Defendants feel prejudiced by the lack of access to this information. To ensure that both sides have a full and fair opportunity to examine the relevant documents and prepare their case, the Court will require that no later than 10 days prior to the hearing, the parties exchange copies all exhibits they intend to present. Further, any party intending to subpoena any other documents may direct the production of those documents occur up to three days before the hearing. Objections to the scope of such subpoenas shall be reserved to the date of the hearing, and will be adjudicated mindful of the extent to which the objecting party attempted to comply in good faith with the subpoena's requests.

Finally, each of the individual Defendants seek to invoke the Tribe's immunity for the claims against them. Whether tribal employees enjoy sovereign immunity for their actions turns on the question of whether the relief requested as a result of those employees' actions would run against the Tribe itself. *Fletcher*, 116 F.3d at 1324. Where employees are sued in their official capacities as officers of the Tribe, immunity is available. *Id.* However, sovereign immunity does not protect tribal employees against claims asserted against them in their individual capacities. *Id.* at n. 12. Moreover, an official who might otherwise be entitled to sovereign immunity loses that protection for acts taken outside the scope of the powers that have been delegated to him. *Burrell v. Armijo*, 456 F.3d 1159, 1176 (10th Cir. 2006).

The Plaintiff's Complaint does not clearly indicate whether it is asserting "official capacity" and "individual capacity" claims,[9] but the manner in which the case is captioned and pled, it appears that the Plaintiff is asserting individual capacity claims against the individual Defendants. It alleges that the individual defendants each engaged in discrete tortious acts and statutory violations, and seeks to hold each individual defendant personally liable for such acts. The key to analyzing an official vs. individual capacity issue is to inquire whether, upon the death

---

[9]The conceptual difference between these two types of claims are not well-understood by many practitioners. In *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), the Supreme Court explained that an "official capacity" suit is simply an alternative way of pleading a claim against the entity employing the official. The real party in interest is not the named defendant, but the entity employing him or her, and indeed, when the named defendant leaves the office he or she occupies, the defendant's successor automatically assumes his or her predecessor's role in the litigation. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). By contrast, an individual capacity suit names the individual defendant as the real party in interest, and seeks relief against the individual for his or her own conduct. *Id.* at 27. Contrary to common misconception, the individual/official-capacity designation does not turn on what capacity (as an official or as an individual, or within or outside the scope of employment) the individual was acting in when the challenged action occurred. *Id.* at 27-28. For example, an individual admittedly acting within the scope of his or her employment may still be subject to an individual capacity suit. *Id.*

or resignation of one of the individual Defendants, would the action likely continue against his successor.  Here, the Court understands the Plaintiff to be challenging the discrete acts of <u>these</u> individual Defendants, not asserting claims against any individual that occupies the position of Casino General Manager or Casino Director.   Thus, is it clear to the Court that the Plaintiff is asserting individual capacity claims against the individual Defendants, and sovereign immunity does not extend to such claims.[10]

Accordingly, the motions to dismiss premised upon sovereign immunity are granted in part, insofar as the claims against the Tribe are dismissed on the grounds of immunity; denied in part, insofar as the individual Defendants are not entitled to immunity; and reserved in part pending an evidentiary hearing regarding the Casino and Economic Development Authority.

### B.  Personal Jurisdiction

The three individual Defendants each assert that this Court lacks personal jurisdiction over them because they do not have the minimum contacts with the State of Colorado.

Faced with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), the Plaintiff bears the burden of establishing that personal jurisdiction exists.  *Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999); *Omi Holdings, Inc. v. Royal Ins. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  The Court may conduct an evidentiary hearing as to any disputed jurisdictional facts, or, if the Court chooses not to conduct a hearing, the Plaintiff need only make a *prima facie* showing of jurisdiction by showing, through affidavits or otherwise, facts that, if true, would support jurisdiction over the defendant. *Omi Holdings*, 149 F.3d at 1091

---

[10]As the preceding footnote makes clear, the fact that the Plaintiff has alleged that the individual Defendants were acting in the scope of their employment at the time of the challenged acts does not bear on the official vs. individual capacity inquiry.

*Soma*, 196 F.3d at 1295.  The allegations of the Complaint must be taken as true unless contradicted by the defendant's affidavits, *Behagen v. Amateur Basketball Ass'n. of U.S.A.*, 744 F.2d 731, 733 (10th Cir.1984), and to the extent that the affidavits contradict allegations in the Complaint or opposing affidavits, all disputes must be resolved in the Plaintiff's favor and the Plaintiff's *prima facie* showing is sufficient.  *Id.*

Here, there is no significant dispute as to the operative facts, thus, the Court need not conduct an evidentiary hearing.  It is undisputed that none of the individual Defendants reside in Colorado, have assets in Colorado, or have any connection with the state other than as a result of the specific actions alleged in the Complaint and supporting affidavits.  The issue presented is whether any of the actions alleged in the Complaint are sufficient to subject any of the individual Defendants to personal jurisdiction in Colorado.

Colorado's long-arm statute provides that a non-resident party subjects itself to the jurisdiction of Colorado courts for claims arising from the party's "(a) transaction of any business within this state; [or] (b) the commission of a tortious act within this state."  C.R.S. § 13-1-124(1)(a) and (b).  The statute codifies the "minimum contacts" test of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and extends the courts' jurisdiction to the maximum extent consistent with the Due Process clause of the 14th Amendment.  *Brownlow v. Aman*, 740 F.2d 1476, 1481 (10th Cir. 1984).  The focus of the court's inquiry is simply whether the exercise of jurisdiction over the individual Defendants comports with the principles of Due Process.  *OpenLCR.com, Inc. v. Rates Technology, Inc.*, 112 F.Supp.2d 1223, 1227 (D. Colo. 2000); *Wise v. Lindamood*, 89 F.Supp.2d 1187, 1189 (D. Colo. 1999).

For purposes of personal jurisdiction, due process is satisfied when the defendant has sufficient "minimum contacts" with the forum state to suffice such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l. Shoe*, 326 U.S. at 316.  The "minimum contacts" test examines whether the defendant has purposefully directed its activities at residents of the forum state, whether the claims asserted arise out of that purposeful direction of activity, and whether the assertion of jurisdiction under the circumstances is reasonable and fair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Teierweiler v. Croxton and Trench Holding Co.*, 90 F.3d 1523, 1532-33 (10th Cir. 1996).

Merely entering into a contract with a Colorado resident, without more, does not amount to purposeful activity in the state.  *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party <u>alone</u> can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.") (emphasis in original); *National Business Brokers, Ltd. v. Jim Williamson Productions, Inc.*, 115 F.Supp.2d 1250, 1254 (D. Colo. 2000), *aff'd*, 16 Fed.Appx. 959 (10th Cir. 2001) (unpublished) ("[t]he law is clear that a party does not submit itself to personal jurisdiction in a distant forum simply by entering into a contract with a party that resides in that forum"), *citing Ruggieri v. General Well Serv., Inc.,* 535 F.Supp.  525, 535 (D. Colo. 1982); *Encore Productions, Inc. v. Promise Keepers*, 53 F.Supp.2d 1101, 1117 (D. Colo. 1999).  Indeed, representatives of a defendant can even enter into Colorado to discuss details of the agreement, *id., citing Associated Inns & Restaurant Co. v. Development Assocs.,* 516 F.Supp. 1023, 1026 (D. Colo. 1981); *Encore Productions*, 53 F.Supp.2d at 1117-18, or make telephone calls and direct correspondence into the state without necessarily subjecting themselves to personal

17

jurisdiction. *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995); *Encore Productions*, 53 F.Supp.2d at 1117; *F.D.I.C. v. First Interstate Bank of Denver*, 937 F.Supp. 1461, 1468 (D. Colo. 1996).

Here, there is evidence that Defendant Stanley went beyond simply entering into a contract with the Plaintiff. Affidavits attached to the Plaintiff's response to Defendant Stanley's motion establish that Defendant Stanley initiated contact with the Plaintiff's offices in Colorado to discuss the purchase of training programs; had other phone discussions with the Plaintiff's employees prior to purchasing a course; called the Plaintiff to purchase a course license for himself; requested that the Plaintiff bill the Casino by invoice sent to Defendant Stanley's e-mail address and caused those invoices to be paid by the Casino; later called the Plaintiff to enroll in two additional courses; physically traveled to Colorado on two occasions to attend the additional courses; and engaged in several other phone calls and e-mail communications concerning the Casino's purchase of the Plaintiff's services.

Of particular significance is Defendant Stanley's physical presence at two courses taught in Colorado. Unlike the contracts in cases like *Encore Productions*, some of the agreements between the Plaintiff and Defendant Stanley called for the Plaintiff's performance to occur in Colorado, and Defendant Stanley's travel to the state was for the purpose of receiving the performance called for by the contract. This is sufficient to permit the Court to find that Defendant Stanley purposefully availed himself of the privileges and protections of transacting business in Colorado, and thus, the exercise of jurisdiction over Defendant Stanley is consistent with due process.

18

The same cannot be said of Defendants Livingston and D'Mello.   The Plaintiff alleges no contact whatsoever between Livingston and itself,[11] and alleges only that D'Mello called the Plaintiff seeking to enroll in a course, sent an e-mail to the Plaintiff accepting a EULA for the course, and received a telephone call from the Plaintiff regarding his failure to complete the course's tests.   Unlike Defendant Stanley's regular contacts with the Plaintiff and physical visits to Colorado, Defendant D'Mello's communications with the Plaintiff were limited and sporadic. Although D'Mello entered into a contract with the Plaintiff, that contract called for performance to take place in California (or, presumably, wherever D'Mello chose to log on to the Plaintiff's website), and other than initiating the single transaction, there is no indication that D'Mello ever directed any activities towards the Plaintiff in Colorado.   D'Mello's contacts with Colorado consisted of nothing more than entering into a contract with a party that happened to be located in Colorado, and does not rise to the level of purposeful availment of the privileges of doing business in Colorado.

The Plaintiff argues that all three Defendants also committed a tort in Colorado, namely, fraudulent misrepresentation and/or conversion, permitting the exercise of jurisdiction over them pursuant to C.R.S. § 13-1-124(1)(b).  Jurisdiction under the statute arises from tortious act committed outside the state of Colorado if that act causes a direct and consequential injury to be felt within the state. *National Business Brokers,* 115 F.Supp.2d at 1255 (D. Colo. 2000). Notably, however, that injury must be something more than a Colorado resident feeling some

---

[11]In the Plaintiff's response to Defendant Livingston's motion, the Plaintiff characterizes Defendant Livingston's actions as "having the company he headed contract with BMG," "having his employees attend two weeks of training," and "causing his company to mail checks."  None of these actions allege Defendant Livingston himself having any <u>direct</u> contact with Colorado.

economic consequence as a result of the conduct. *Id., citing Amax Potash Corp. v. Trans-Resources, Inc.*, 817 P.2d 598, 600 (Colo. Ct. App. 1991), *and Wenz v. Memery Crystal,* 55 F.3d 1503, 1508 (10th Cir. 1995). Here, both the offending conduct and the direct injury occurred to the Plaintiff in California, where its copyrighted materials were impermissibly used. Its only injury in Colorado arises from the fact that, had the Defendants properly paid for the classes for their employees, that revenue would have flowed to the Plaintiff's headquarters in Colorado. This is precisely the situation found in *National Business Brokers*, *Amax*, and many of the other cases cited therein, and in each instance, the court found that the economic injury was insufficient to confer jurisdiction under C.R.S. § 13-1-124(1)(b).

The Plaintiff cites to *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 235-36 (Colo.. 1992), a case in which the Colorado Supreme Court found a basis for personal jurisdiction based on a tortious act where an auto dealer in Nebraska had made several misrepresentations of fact over the phone and in writing to a Colorado resident, inducing the Colorado resident to travel to Nebraska and purchase a car. The court held that the various misrepresentations "formed an important part of the basis of the commission of a tortious act," and that they were "received within this state." *Id.* at 236 (internal punctuation omitted). Noting that the auto dealer never left Nebraska, the court nevertheless found that "the misrepresentations were not complete until received . . . in Colorado," and that this was sufficient to find that the tortious act occurred in this state. *Id.*

The Court finds that *Classic Auto* does not warrant exercising personal jurisdiction over Defendants Livingston and D'Mello in Colorado. First, the Court notes that the Complaint does not appear to adequately state any tort claim against Defendants Livingston and D'Mello. The

Plaintiff does not plead the alleged fraudulent statements with any particularity as required by Fed. R. Civ. P. 9(b), and couches most of its factual averments as against "Defendants" generally and collectively.  Although the Defendants have not specifically moved to dismiss the tort claims under Fed. R. Civ. P. 9(b) or 12(b)(6), the Plaintiff has relied upon its pleading of these torts to demonstrate personal jurisdiction, and thus, the Court considers whether that pleading is sufficient.

Assuming, however, that the Plaintiff's tort claims are sufficiently pled, the Court finds that *Classic Auto* is distinguishable on its facts.  There, the Colorado Supreme Court found that the tort of misrepresentation was <u>committed</u> in Colorado, not that merely the harm was felt here.  It observed that the auto dealer made numerous misrepresentations to the buyer, and that "the misrepresentations were not complete until received by Schocket in Colorado." *Id.* at 236.  The Plaintiff suggests that each of the individual Defendants made the same sort of misrepresentations to it in Colorado, but the Complaint does not allege that.  Although the fraud claim is captioned as being asserted against "All Defendants," its body states only that "Defendants Casino, Stanley, and D'Mello" made false representations; it makes no allegation of a false statement by Defendant Livingston.  Moreover, the reference to a false statement by D'Mello is curious, in that there is no substantive allegation anywhere in the Complaint of any false statement having been made by D'Mello.[12]  Accordingly, as to these two Defendants, the Court finds that personal jurisdiction

---

[12]The Complaint makes no mention whatsoever of D'Mello separately agreeing to a EULA and taking a course from the Plaintiff.  Although those facts are asserted in the evidentiary material in support of the motion here, the Court will not deem the Complaint to be amended by this evidentiary material.  The Court declines to speculate as to whether its findings as to personal jurisdiction over D'Mello might differ if the Complaint were properly amended.

based upon these Defendants' commission of a tort in Colorado is not supported by the allegations in the Complaint.

The Court has considered the remainder of the Plaintiff's arguments with regard to the issue of personal jurisdiction over Defendants Livingston and D'Mello and finds them to be without merit.  Accordingly, Defendant Livingston and D'Mello's motions to dismiss for lack of personal jurisdiction are granted, and Defendant Stanley's motion to dismiss on this ground is denied.

### C.  Sufficiency of pleading specific claims

The Chukchansi Defendants move to dismiss the RICO claim against them, stating that as governmental entities, they are categorically immune from such claims.  Defendant Stanley moves to dismiss the RICO claim as insufficiently pled.  Because the Chukchansi Defendants' arguments are mooted if the RICO claim is dismissed as insufficient, the Court will address the sufficiency of pleading first.

To plead a claim for civil RICO, the Plaintiff must allege: (i) that the Defendants participated in the conduct; (ii) of an "enterprise"; (iii) through a pattern; (iv) of racketeering activity.  *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 838 (10th Cir. 2005); *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1100 (10th Cir. 1999).  An "enterprise" is "an entity [comprised of] a group of persons associated together for a common purpose of engaging in a course of conduct," and is shown by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function a as a continuing unit."  *U.S. v. Turkette,* 452 U.S.. 576, 582-83 (1981).  "Racketeering activity" is defined as being any one of several violations of law set forth in 18 U.S.C. § 1961(1), among

22

them acts of mail and wire fraud and criminal copyright infringement.  A "pattern" of such activity consists of two or more acts of racketeering activity within a period of 10 years that are related and demonstrate a threat of continued criminal activity.  *Duran v. Carris*, 238 F.3d 1268, 1272 (10th Cir. 2001); *Gotfredson v. Larsen LP*, 432 F.Supp.2d 1163, 1174-76 (D. Colo. 2006). Predicate acts are "related" if they share the same or similar purposes, results, participants, victims, or methods of commission.  *Gotfredson,* 432 F.Supp.2d at 1174.  A threat of continued criminal activity is demonstrated by means of showing either open-ended or closed-ended continuity.  *Id.*  "Closed-ended continuity" is established by showing a series of related predicate acts extending over a substantial period of time; a pattern of acts over a few weeks or months and threatening no future criminal conduct do not satisfy the requirement.  *Id.*  "Open-ended continuity" is shown by demonstrating that the predicate acts, by their very nature, involve a distinct threat of ongoing racketeering activity, or that the predicates are a regular way of conducting the business of the Defendants or of the RICO enterprise.  *Id.*  A set of predicate acts constituting a single scheme to accomplish a discrete goal against a discrete victim, with no potential to extend to other persons or entities, is insufficient to show either type of continuity. *Id.*

The Complaint fails to adequately allege the existence and nature of the enterprise, or a pattern of activity.  With regard to the enterprise requirement, the Plaintiff pleads, in six consecutive and otherwise identical paragraphs, "Defendant _____ acquired control, maintained control, conducted, and participated in the conduct alleged in this Complaint through a pattern of racketeering activities."  This does not allege an "enterprise," as it does not assert that these Defendants associated together for a common purpose, nor that they functioned as a unit.

Moreover, the Complaint does not allege a pattern of activity, insofar as it does not allege a threat of continuing racketeering activity or either open- or closed-ended continuity of the racketeering activity.  Accordingly, the RICO claim is dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(6).[13]

The Chukchansi Defendants also move to dismiss the Plaintiff's tort claims of conversion and misappropriation claims as being preempted by federal law.  17 U.S.C. § 301(a) provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright" are preempted by the Copyright Act.  Preemption occurs if: (i) the work is within the scope of the "subject matter of copyright" under 17 U.S.C. § 102 and 103; and (ii) the rights granted under state law are equivalent to the exclusive rights established by federal copyright law.  *La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1199 n. 2 (10th Cir. 2005), *citing Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 847 (10th Cir. 1993).  On the other hand, a state-law cause of action which requires an extra element beyond mere copying or preparation of a derivative work – *e.g.* a claim for unfair competition, tortious interference, or breach of contract – is qualitatively different from a copyright claim, and thus, is not preempted.  *Id.*

---

[13]The Court will not reflexively grant the Plaintiff leave to amend the Complaint to re-plead the RICO claim, as it has some doubt that, under the facts suggested here, a valid RICO claim could ever be alleged.  By all appearances, the Plaintiff alleges a single scheme with a discrete goal and a single victim – *i.e.* that the Defendants conspired solely for the purpose of obtaining the Plaintiff's copyrighted content for subsequent re-use without paying for it.  As discussed above, this type of single-focus conduct, however unlawful it may be in other respects, does not constitute a RICO violation.  If, after full consideration of the governing law and available facts, the Plaintiff still believes that it can assert a viable RICO claim, it may move for leave to amend to do so.

Turning to the first element, the Plaintiff clearly alleges that the content of its courses is within the scope of copyright protection.[14] The Plaintiff's claim for conversion under Colorado law has essentially one element: that the Defendants asserted dominion or ownership over personal property belonging to another. *Glen Arms Assocs. v. Century Mortg. & Inv. Co.*, 680 P.2d 1315, 1317 (Colo. App. 1984). In the context presented here, this claim would be established by showing: (i) that the Plaintiff was entitled to assert control over the contents of the course as the result of its copyright, and (ii) that the Defendants exercised improper dominion over the contents of the course by copying and altering them. There are no additional elements to the claim beyond the existence of a copyright and a copying, and thus, this claim is preempted. Similarly, a claim for misappropriation under Colorado law occurs "when one either wrongfully profits from another's expenditure of labor, skill, or money, or capitalizes wrongfully on commercial values earned over a period of time." *Heller v. Lexton-Ancira Real Estate Fund, Ltd.*, 809 P.2d 1016, 1021 (Colo. App. 1990). Once again, in the context presented here, the only element to be proven on this claim is that the Defendants wrongfully appropriated the Plaintiff's copyrighted content. This claim, too, is thus preempted.

The Plaintiff argues that their claims are not preempted because they allege more than mere copying; that they allege that the Defendants "branded [the Plaintiff's] work as their own and misrepresented to everyone participating in their employee training program that they were the true owners of the content." Although this may be an accurate statement of the Plaintiff's

---

[14]The Plaintiff argues that because the Defendants have not answered, it does not know whether they will contest whether the content is copyrightable. This is irrelevant, as a motion to dismiss is based on the allegations in the Complaint. If the Court eventually determines that the content of the courses is not copyrightable, the Plaintiff may amend the Complaint to reassert the common law claims.

position, it is clear from the discussion above that the Defendants' actions of "branding the work as their own" and misrepresenting to others their ownership are not required elements of a claim of conversion or misappropriation.  Interestingly, the Plaintiff cites to several cases for the proposition that "palming off claims [are] not preempted."  However, neither a conversion nor a misappropriation claim is the equivalent of a "palming off" claim.  Accordingly, the conversion and misappropriation claims are dismissed as preempted.

### D. Venue

Defendant Stanley moves to dismiss the Complaint for improper venue.  Without belaboring the analysis, the Court finds that venue is proper in this District pursuant to 28 U.S.C § 1391(a)(3) and (b)(3), in that Defendant Stanley is subject to personal jurisdiction in this District. The Court does not construe Defendant Stanley's motion as one to transfer venue for convenience under 28 U.S.C. § 1404, and expresses no opinion as to whether such a motion might be appropriate under the facts here.

### CONCLUSION

For the foregoing reasons, the Chukchansi Defendants' Motion to Dismiss (**# 19**) is **GRANTED IN PART**, insofar as the claims against Defendant Picayune Rancheria of the Chukchansi Indians are **DISMISSED** on the grounds of sovereign immunity, and insofar as the Plaintiff's common-law claims for conversion and misappropriation are **DISMISSED** as pre-empted by federal law, and **RULING IS RESERVED IN PART**,[15] as to the immunity of Defendants Chukchansi Gold Casino and Resort and Chukchansi Economic Development

---

[15]For administrative purposes under the Civil Justice Reporting Act, the Clerk of the Court shall deem this motion resolved.

Authority, which will be determined at an evidentiary hearing on **October 23, 2007** at **1:30 p.m.** on the terms set forth herein. Defendant Livingston's Motion to Dismiss for Lack of Jurisdiction **(# 23)** is **GRANTED**, and the claims against Defendant Livingston are **DISMISSED** for lack of personal jurisdiction. Defendant Stanley's Motion to Dismiss for Lack of Jurisdiction **(# 28)** is **GRANTED IN PART**, insofar as the Plaintiff's RICO claim is **DISMISSED** without prejudice pursuant to Fed. R. Civ. P. 12(b)(6), and **DENIED IN PART**, in all other respects; the Plaintiff's Motion to Convert **(# 41)** the Defendants' motions to dismiss to summary judgment motions pursuant to Fed. R. Civ. P. 12 and 56 is **DENIED AS MOOT**; Defendant D'Mello's Motion to Dismiss **(# 61)** is **GRANTED**, and the claims against Defendant D'Mello are **DISMISSED** for lack of personal jurisdiction; the Plaintiff's Motion to Convert **(# 72)** Defendant D'Mello's motion to dismiss to a summary judgment motion is **DENIED AS MOOT**. Defendant Stanley's Motion to Join **(# 80)** is **DENIED AS MOOT**. The caption of the case is **AMENDED** to remove Defendants Picayune Rancheria of the Chukchansi Indians, Livingston, and D'Mello.

Dated this 12th day of September, 2007

**BY THE COURT:**

Marcia S. Krieger
United States District Judge